1-6-11-32 Franklin Lewis et al. v. City of Detroit, Michigan Arguments not to exceed 15 minutes per side. Ms. Bogus for the appellants. Thank you. I deserve two minutes. You're welcome, Your Honor. Good morning. Good morning. Kathleen Bogus representing the plaintiffs in this action. I have the honor to represent five well-distinguished and honorable people in the command, division of the Detroit Police Department until the now police chief, James Craig, became the police chief. Over the years, I've gotten a number of opinions from appellate courts and from trial courts, and sometimes I shake my head and I say, I lost, but I don't, and I get why I lost. Sometimes I win and I say, I don't know how I won, but I did. And sometimes I say, I should have lost or I should have won. This case I look at and I don't understand. Maybe I can help you. For four of your five plaintiffs, isn't this a reduction in force case? Well, it's a reduction in force really across the board. There's no one-on-one. It is a reduction in force across the board. For that, you need additional proof, right? That's correct. And my question is, what additional proof did you have for those four of the five plaintiffs that you needed the additional proof? We have these statistical evidence that shows how the numbers were skewed for devoting the older individuals and promoting the younger individuals. We've given the court the ages, which the defendants have provided to us. They provided to us as well in discovery, and they show a clear pattern of preference of devoting the older individuals and promoting the younger individuals. But didn't the evidence show that there were basically non-age factors that weighed in the decision rather than just an age-based determination, for example? I know you make a lot of the fact that with respect to one of the plaintiffs, there was a comment that he was retired on the job or something to that effect. That comment couldn't it equally have a bearing on somebody who's not productive or somebody who's basically just doing the actual work and is just riding the clock? That's correct, and that's one question Judge Cohn asked me in oral argument. But it does have another interpretation as well, and it wasn't just Commander Lewis that he used the term. I had an impression he was retired in place. There's testimony that he used that terminology a number of times, and Deputy Chief LaValle testified in his deposition that that referred to generally older individuals because you used different terminology for him. But that terminology was not used for the other plaintiffs. It was not used by Chief Craig in his deposition for anybody specifically other than an impression of Commander Lewis. However, there is testimony that he repeated that phrase a number of times throughout the selection process. And in fact, the selection process, there were no safeguards in that process to prevent illegal discrimination. We hear a lot from the defendants, and I appreciate the fact that the city of Detroit had an emergency manager law, and I appreciate the fact that the city had certain employment rules, but that doesn't give them carte blanche ability to disregard the civil rights law. Well, is there proof, though, that the consultant hired to help make these determinations actually communicated the various ages of these individuals to Chief Craig for his decision-making purposes? Didn't he provide a report that led to a number of factors? And some of those factors are information that people who were interviewed relayed to the consultant. Is there any indication that the consultant relayed this age-specific information to Chief Craig? What we have are years in service, which we believe shows an addition of age, and we have one individual he referred to as a contemporary. But years in service is not the equivalent. I mean, you can't just equate that with age. Obviously, in order for a person to have so many years in service, there's got to be a certain age, but those two aren't – those two are used to perfectly align with each other. Well, it's a totality of the circumstances, too, as William Brenner – I mean, if you look at the selection process and you look at the flaws in the selection process, you look at the repeated statement by Chief Craig of retirement place, you have no performance evaluations that are being compared against others. We don't have qualifications being compared against each other. We just have selections, and, you know, Judge Craig – I mean, Chief Craig talks about, I had impressions. I don't know where I got them from. I had these impressions. There was no objective selection process used here. It was all subjective, even speaking to individuals. Mr. Wasserman, the consultant, spoke to individuals, but those are all impressions. What do you do about – what do you do about the fact that he was also promoting older people? But they were – it was like one or two – I mean, one or two older people – Okay, so that goes to the statistics, and I found it somewhat confusing. As I understand it, he started off with 18 commanders, and then they were left with nine. Correct. But a number of them retired on their own. I believe two. Only two? I believe you are correct, but I believe it was two. I'm sorry, what? I believe it was two that retired. My memory could be faulty on the two, but that's my recollection. But we went from an age range – I know, but I'm trying to get there with you. So when I look at the chart in your – on your – it has – okay, this kept me – like on page 19, it says commanders, three, the organization, and there's seven. I'll just make sure I look at the same thing again. Okay, I'm looking at the chart. Are you looking at the pre or post? I'm sorry. It's on the same page? Right. Okay, so I just – where are the others? Where are the other 11? For the pre-organization? I'm looking at that, Your Honor, and this is the information that we were given by the defendants. This is directly out of the spreadsheet they provided to us. Right, and that spreadsheet doesn't – doesn't have 18 either. But this is what the evidence that they have provided to us as being the numbers. And if you look at the ages, I mean, you can say older people are promoted. We have one who's 52. The rest are in their 40s. Yeah, look at what we had before the reorganization, the ages. We had a 62, 59, 57, 51, 50, 49, 46. And then in terms of the reasons that were given for each one of the plaintiffs, do you have a response to that? I mean, do you have something that says that it's, you know, one of the three problems of pretext? Yes. First of all, we have pointed out in our brief what Judge Cohn – that the trial court judge stated certain testimony wasn't the case, looking at some certain documents, and we have pointed out in our brief how that was incorrectly stated testimony regarding each, I think, three of the five individuals that's contained in our brief. Also, I think it's very important to point out that for three of our clients, Judge Cohn, while saying their positions were eliminated, then said, oh, they were replaced by somebody not within that six-year period, the Grosjean, Bright Light, Standard, or maybe DEA, but not under Elliott Larson because there is none that exists. Judge Cohn said, oh, even though the positions were eliminated, those three were replaced. And then for the other two where the age was greater, said, oh, it's for a different reason. So it's like a cherry pick as to what's happened here. So do you – you said this in the beginning. I just want to make sure I understand. You contend that none of them were replaced? No, not commanders. The testimony is replete in the case that the commanders' responsibilities and the whole system was changed. They didn't have the same geographical areas anymore. They had different responsibilities. Chief Craig, if you want to say Judge Craig, Chief Craig repeatedly testified about how he reorganized the whole command structure, and there were no one-on-one replacements. Now, I anticipate what defense counsel may say is that one or two of my clients said they thought they were replaced with a Mr. A or Commander B, but the fact of the matter is the testimony from James Craig and from the other command staff officers, which we've cited, is, in fact, there was a whole reorganization, and there were not one-on-one replacements. Yes, Judge Cohn found for three of them where there were one-on-one replacements. So is your theory that this whole reorganization was a scheme for age discrimination? Oh, I wouldn't be hard-pressed to say it was a scheme. Well, it seems like that's what you're saying. Well, Judge, the thing is there was impermissible consideration given for age and proof of that is nothing if you don't believe the statements are enough, and I think they're in dish up, is what happened with the ages. I mean, these men did not have stains on their record. There's no objective comparison between these people. But the department is going from 18 to 19. I mean, people are going to be played off. I don't disagree with you. However, there are some retired, as we said, but they promoted and double promoted some of these much younger individuals into these positions, and the people that I represent didn't just get bounced down one level. They got put back in the rank of five, and that's why many of them retired because it would have affected their retirement money. But I think it's also important to point out that the trial court appeared to have really tried to hack them, to find the way they did, because on page 18 of the opinion, I've never seen anything like this, it says, Further, while plaintiffs choose to file an age discrimination suit, six other individuals who either retired prior to the appointment or accepted their lower-ranking positions on the executive team chose not to file a complaint against the city. The fact that the five plaintiffs here are the only former city employees to claim age discrimination speaks for itself. With all due respect to the court, that's ludicrous. First of all, two of the other people I represented at the EEOC, so seven of them had filed, and two people decided they weren't going to file a lawsuit. This is like saying, you know, five women are sexually harassed, but only one comes forward. You don't know why the other one didn't come forward. So to say that that's part of evidence as to why some re-judgment should have been granted, in all due respect to the trial court, it's just ludicrous. And I would hope we never see any citation that anybody can ever make regarding that. I only have a few seconds left, it appears, because I've got more to say, but I'm not going to go into any other questions I can answer. I just want people to understand, obviously you know that this is a very important case to my clients, just like the city in their findings says how important it is to them that the chief has unfettered discretion. The chief has legal discretion, not unfettered discretion, and we ask the court to reverse the trial court in this matter. Thank you. Good morning. Good morning. The city wants you to know that – I'm sorry, Patricia Jones for the city. The city wants you to know that these are appointments. This was no different than when the President of the United States gets elected and comes in and creates his own cabinet. Some may be asked to stay, some are let go. That is what occurred here. It's no different. There was no age discrimination. He met – and for them to say it was age is false. I would like to answer your question to her though as to the 18th before I go into my argument. As to the 18th, the judicial reports show that there were vacancies, so some of those positions were vacant that were eliminated. So if you look at the situation, this is hypothetical. Let's say you have – I think there were maybe 40 people subject to being – as I understand it, it was basically a completely shut-in. It was 37 positions of which 9 were over the age of 50. Two were under the age of 40. Wait, wait, wait. I'm sorry. There were 37 – there were a total of 37 positions. Nine were over the age of 50. When you say positions, you mean – On the executive team. Counsel focused solely on the commander position, but the problem with that is, one, you have to look at the entire applicant pool. Two, one of the plans wasn't even a commander, so the entire commander position – I know she focused on that, but she also went on several other pages to address other – When you say there were 37 positions, does that include the ones that were empty? No. Okay. There was 37 selected positions. That were in – that were occupied. That were eventually occupied. Well, I'm trying to figure out what you say. Prior – were there 37 people subject to this, or were there 37 positions? There were 37 positions to be slotted. Okay, to be slotted. Okay. And when – before this, how many positions were there? I'm not aware of how many there were at this point in time, but according to the attrition, there were attrition reports given, too, as evidence that showed the number of positions that were vacant. How many people were subject to this? Possibly 40. 40? Yeah, possibly 40. Okay. And of the 40 people that were subject to this, you started to say what their ages were? Yes. When we had the reorganization, he eliminated certain positions and created other positions. Right. So you had the commander positions merged into Commander West and Commander East. Right. Okay. So at that point in time, the people who were eliminated would be de-appointed back to the position – not eliminated as in the President's Cabinet selection, but de-appointed back to their position prior to an appointment. Right. But what I'm trying to find out is how many people were subject to this reorganization and what it looked like before and after. And I thought you started to tell me what happened to people of different ages. I can only tell you what – because I don't have the figures prior to the reorganization. I can only tell you that after the reorganization, there were 37 spots, of which 9 were older than 50 and 2 were less than 40. I hadn't anticipated that. Okay. The rest were in their 40s. Okay. So let me just ask you this. If you have a situation – and this is entirely hypothetical – if you have a situation where there are 40 people in an assortment of slots and they're – if you look at it, they're – I'm not sure if this is – okay. Let's say you have a group of people, 50 people, and they're varying ages. And if you take them and you say, okay, this group is 50 and over. This – or 48 and over. This group is younger. And you look at what happened. When you look at the older group, say 85 percent of the people ended up either demoted or double demoted. Fifteen percent ended up promoted or kept their spot. And then if you look at the younger group, it's the exact opposite. Eighty-five percent ended up being promoted and 15 percent were demoted. But there were other factors, non-age factors, that were involved. They can't show that age was a – even a factor, let alone a motivating factor. Because, one, when the chief – prior to the chief's official date, he met with the – with Dolan, the union president of the executive board, and advised them. He was restructuring the position. The EM had already received – retained consultants to do a plan, which has been given to you as part of the record. Developed a plan on what should take place in order to make the department more efficient. They asked – this was prior – all prior to him getting there. Let me make it clear. I don't think anybody's arguing that this was a ruse to get rid of older people. I think everybody accepts that this was a plan to reorganize the department, both because it was top-heavy and because it wasn't functioning properly. Total lack of leadership. And they wanted to get – they wanted to reorganize things. So accepting that. You could still accept that, and then somebody goes in and goes, okay, we're reorganizing. We're going to get rid of all the old people and remove the young people. I mean, there's still room within that structure for age discrimination. But that's not what happened, because in looking at the individuals that were removed, when they were first appointed, they were appointed at that similar age of 41, 42. Secondly, if you take the entire applicant pool, which was 92 or 96 individuals that applied for these positions, if you take the average age of that, that was 47. And council had all the applications, so they could look at that. But if you look at the average age at 47, there was not a significant disparity here. When you're saying the age of the applicant pool was 47 and what, the people in the position after, what was the average age? The people who were in position after? Over the age of 50, there were 37 positions. There were 16.2. And in the age of 40, 49 or 78.4. I'm looking at the total of the people, the percentage in the various age brackets. Of the applicants? Of the 37. Didn't you have that broken down by numbers other than percentages? Well, I did break it down in numbers. I said nine were over the age of 50 and two were under the age of 40. Right. So, as to the statistics, and I bring your attention to one of the cases here, the statistics that they show, taken into account as a whole, as sister council mentioned, taking all the evidence as a whole, they cannot get an inference of discrimination, even if you look at the average, because the average does not show that it was the cause of, that discrimination was the cause of the disparity. I'd like for you to give, to discuss what weight should be given to some of the apparent age-related remarks that are in the report. And Council Member Plano says this indicates that many of those decisions were made and targeted people based on their age, such as the comments about being retired in place, and whether or not Mr. Wasserman was communicating this information about the age of these individuals to the chief for purposes of making the decision on the election in force. Unfortunately, Wasserman's transcript, although his deposition had been taken, his transcript wasn't made available in time to put it as part of the record. However, he did testify that he did not share his notes with the chief. He did testify as to mentioning to the chief, giving recommendations as to what, I'm sorry, Jones, Eric Jones, that's the AC, and Yost, those are the only two people. Even if he didn't say this person is 53 or this person is 59, communication about 30 years in service or 32 years, doesn't that give information about age? I'm sorry, I didn't mean to interrupt you, but there's several cases that support that that is a non-age factor because they're analytically distinct years of age. You can come on to the Detroit Police Department at 18, and for 25 years you can be 43 years old, so that has nothing to do with it. Further, he wasn't a decision-maker for any of the comments that he may have made, such as Wasserman, the comments that he took down in his notes, the comments given to him, and he was taken down notes. Even though he wasn't a decision-maker, the chief was clearly relying on information from the consultant to make his part of this reorganization decision. As to the reorganization decisions, not as to the selection of the executive team, and as to the retired-in-place, the retired-in-place comment, yes, it did come from Chief Craig, as he related in his assessment of Lewis. However, in his testimony, he specifically said there was an absence, and he referred to the phrase as an absence of management, absence of leadership. To use LeValley's testimony, LeValley stated that they referenced younger people as thugs and older people as retired-in-place, meaning in both instances that they were not productive. As to the comments, I do want to touch on a couple of things. They mentioned direct evidence. All of the direct evidence relies on those statements, and those statements, as I explained, are not direct evidence. They require an inference because they can be used in different ways. So they show no direct evidence. That's first and foremost. And as it relates to circumstantial evidence, the circumstantial evidence that they present, specifically in the statistical area, there are, when using statistical evidence, and I'm relying on Bender v. Hedge, Department of Store, 455 F3D 612, citing to Steger v. Smith, 738 F2D 1249, they must show a significant disparity and eliminate the most common non-discriminatory explanation for the disparity. They cannot do this. They cannot show it because the chief met with the union president prior to and explained there would be promotions and eliminations. The chief had authority under CT as well as under the emergency manager order. The chief made his selections based on his observations, his assessment from the community leaders, especially as to Cerda and Yost, his assessment as to what the others, White and Jones, brought to him as far as recommendations. Even though they gave him the recommendations for who they believed would be the best in those positions, he overrode them in several instances. For example, Haw, she didn't get an interview. She was selected. She was recommended for STEM. She was recommended for captain. She was made commander. There were several instances, Lewis and Cerda were both on the recommendation list, but he chose not to select them until Jones pled on the service for half, tearfully pled, said, look, we've got to put him somewhere, and he was made captain. I want to reiterate, this was exactly like a presidential cabinet election. Do you agree that the standard under the Elliott-Larsen Act is different than under the ADA? Yes, I do. The standard under the Elliott-Larsen Act requires that there be a motivating factor separate from the fact that under the ADA it has to be a factor. If they cannot prove a factor under, that it was a factor at all under the ADA, then you certainly can't prove it was a motivating factor if it wasn't a factor at all. Does ADA have to be but for? ADA is but for, yes. Any further questions? Thank you. Ms. Jones. Thank you. We ask that you uphold the lower court's decision. I'm asking the court to look at all the positions, not just the commander position, and that's why we have given you the evidence regarding that, the assistant chief, deputy chief commanders, and captain inspectors, because when that group is taken as a whole, you will see that and we've given you the numbers and the ages are dramatically different. As the applicant pool, they say 47, the average age was 43 as to those who were appointed. So I'm asking you to look at the entire command structure. That's a 40-ish person group to look at. Also, I point out that the chief did not just rely on the consultant Wasserman for input. He had his assistant chiefs and deputy chiefs. Once they were interviewed and put in place, they're the ones who interviewed the other positions. Of course, none of my clients got interviews, so there was no input from the assistant chiefs and deputy chiefs who we deposed regarding any interviews with my client. They testified because they did not interview them, so could not give input. How many do we know? Do we have any information on how many people got interviews? No, they don't have records. Huh? They don't have records. That's another problem with it. There's a lot of flaws. There's no safeguards here against discrimination, absolutely none. When it's an informal process, when you listen to people, you don't even know who they are. You just get impressions. There's no documentation except for Mr. Wasserman. And the chief cannot say with specificity why he picked somebody over another. There's absolutely no safeguards, nothing objective. Everything's subjective. And the method of selection leaves wide open the ability to discriminate illegally, and we believe under the summary judgment standard that we should be given inference, and we weren't given any in that opinion. And we ask the court's reviewers to make their own decisions. Thank you for your time. The case will be submitted in the following days.